Thank you, Your Honor. May it please the Court, my name is Evan Mandel, and I represent Plaintiff-Appellant Dr. Syed Mohammed Aftab Karim. Dr. Karim is a brain surgeon, and defendants ended his career. This is an appeal of a motion to dismiss. The easiest issue I would submit on this appeal is the dismissal of Dr. Karim's discrimination claims. The only basis for the dismissal of those claims was that Dr. Karim failed to plead any discriminatory motive. However, I believe he successfully pled that discriminatory motive for four reasons. First, the services that Dr. Karim would have provided at Lincoln were instead provided by a non-Muslim white. Second, defendants falsely claimed that Dr. Karim's prior employer said he had poor interpersonal skills, which is a common stereotype of Muslims. Three, defendants ran roughshod over their own procedures, including Dr. Karim's right to see the accusations against him, his right to respond to those allegations, and his right to a timely ruling. Under this Court's decision in Maneker, procedural irregularities are, in and of themselves, evidence of bias. Fourth, there is an abundance of evidence that defendants' proffered bases for denying the credential is pretextual. The information that defendants received about Dr. Karim was overwhelmingly positive. Defendants ignored that positive evidence and instead relied upon fabricated negative reviews. A government agency concluded that defendants' denial of Dr. Karim's credentials was baseless in order for defendants to reconsider their decision, but defendants refused to reconsider it in any meaningful fashion. And when defendants were finally challenged that there was no problem with Dr. Karim's interpersonal skills, they manufactured a completely baseless reason for denying the credential, which was the supposed lack of malpractice insurance. I will now turn very briefly to Dr. Karim's due process claim, which is premised on both a property interest and a liberty interest, and I'll take the property interest first. In Greenwood, this Court said that a physician's hospital credentials constitute a constitutionally protected property interest where the hospital's bylaws create due process rights in the credentials. Here, Lincoln's bylaws explicitly promise physicians due process, and there are additional facts that support the property interest in this case. Two very notable ones. The first is that Dr. Karim actually had a contract to do the job for which he was receiving the credentials, and second, that in the 227 applications about which we received discovery, Lincoln did not deny any doctor's applications for credentials. With respect to the liberty interest claim, this case is just like Valmont and Brandt. In those cases, an employer said something so stigmatizing about an individual that it would make it extremely difficult for the individual to obtain future employment. That is precisely the case here. Dr. Karim has been unable to obtain employment since his credential was denied. Defendants argue that Dr. Karim has failed to satisfy the liberty interest claim's temporality requirement. However, in Brandt, this Court held that a temporality requirement is satisfied so long as the defamatory statement is placed in the employee's file close in time to the termination, and that's at page 45. That clearly happened here, since defendants claim that they relied upon these statements in deciding not to issue the credential to Dr. Karim. Finally, I will note that in both Brandt and Valmont, this Court held that the plaintiff need not actually wait until he's rejected from a job to bring a liberty interest claim. To force the plaintiff to apply to jobs that were likely going to reject the plaintiff would be to put him, quote, between the devil and the deep blue sea. That's Brandt at page 45 again. And the Court specifically rejected any rule that would put a plaintiff in such a position, and that is exactly where Dr. Karim stands today. Thank you very much, and of course I'm happy to address any questions that the Court may have. Thank you, Mr. Mendel, very much. You've reserved three minutes, and I'll turn to Judge Lynch and then to Judge Marrero for questions. All right, thank you. I have just two questions. The first relates to what you said about pleading a discriminatory or a prima facie basis for thinking that there is a discriminatory motive. And I realize you raised several points on that, but just one of them, I'm just puzzled about the structure of it. You said the person who is now providing the services to the hospital that he would have provided is a non-Muslim. And I'm just puzzled. I was under the impression that Dr. Karim was offered a job by a practice group, but he could only have that job if he could get credentials. Is this non-Muslim doctor that you're talking about, do you mean that that's the person that was eventually hired to fill his slot at the practice group? No. Your Honor's understanding of the facts is correct. Dr. Karim was going to provide services at Lincoln through Westchester Neurological. I'm just trying to understand the relationship between Westchester Neurological and the hospital. Normally, when we have cases where a person of one race or gender is turned down for a job and says, well, there's a reasonable inference of discrimination because the person who got the job was of a different race or gender. It's the same employer. And here I'm just trying to figure out, you say the doctor who's providing the services that he would have provided, but the services in an employment sense would be provided to Westchester Neurological? I mean, the way Lincoln hires its doctors, it has an affiliate called something like the practice group and that practice group retains the doctors. And first, Westchester Neurological was providing the services. As far as we know, Westchester Neurological was just two people. It was Dr. Doss and it was going to be Dr. Karim. When they didn't hire Dr. Karim, when they rejected Dr. Karim's credential and Lincoln did, Westchester Neurological was replaced by Dr. Demetia's entity. And we believe that Dr. Demetia was the only one who was going to be providing services through that entity. This is on the appendix on pages 1079 through 81 where the defendants admitted that Dr. Demetia's entity was the quote successor for Westchester Neurological. Okay, I'm still having, maybe I just don't understand the medical profession. I always thought, and maybe this is very old fashioned, or maybe it was always wrong, that if I were a doctor and I had a particular kind of practice, and I had a license, I could open a practice all by myself. And then if one of my patients needed to be hospitalized, I would need to obtain privileges with a particular hospital. Is that not the structure of how this is actually working here? I understand there's essentially two different kinds of types of ways that patients and doctors interact with each other at hospitals, although I had to learn this for this case, I must confess. One is what Your Honor just described. The other is the way I think it really works at Lincoln, where none of these doctors are admitting their private patients at Lincoln. They're admitting their private patients at some other hospital. These doctors are being hired to provide services to the patients who show up at Lincoln. So you show up at Lincoln because you're in a car accident, you need brain surgery. Had Dr. Kareem's credential been granted, he would have provided that brain surgery. When it was rejected, Dr. Demetia wound up providing that brain surgery instead of Dr. Kareem, and it's Lincoln that decided which doctor was going to be providing that service to their patients. Thank you. That's very helpful. The other question is about the due process. You said there's a property interest because the bylaws of the hospital say that we'll give you due process. Why isn't that just a contractual promise? In other words, if I say to somebody, I'm going to be fair and I'm not going to do anything without having a trial with a transcript and a lawyer before I touch you or whatever, or every applicant for a job is going to get this extraordinary panoply just as if they were getting tried for a crime in federal court. Why does that make a property interest rather than just a contractual promise that we're going to follow these procedures? Sure, and I think it's not unrelated to the questions that were being asked of the attorneys in the last case. Under the due process clause, the Constitution often looks to state law to determine whether there's a constitutionally protected property interest. This court in Greenwood looked to the bylaws of the government hospital to determine whether the state law had extended a property interest in a credential, and not only did they find that the bylaws did in fact establish such a property interest, they found that every circuit court should have considered the question. Wasn't that someone who already had the job? In the facts of that case, that is absolutely correct. So isn't there a difference between saying, if we hire you, we're hiring you with tenure, and you can't be fired for the rest of your life except for cause, then there's a property interest and due process clicks in. That's still different, it seems to me, from saying, if you want a job here, we promise we'll be fair in deciding whether to hire you or not. That seems to be a different thing as a kind of promise of procedural rights that they're promising. Am I wrong about that? There could be some case where that's true. I don't think that's true in this case, because the Lincoln bylaws promise identical due process protections to a doctor who is applying for the first time, and a doctor who's been practicing there for 30 years. Both doctors are guaranteed due process. Okay, thank you. Judge Marrero. You argue that your client was denied his rights and discriminated against because a person who took the job that he would have had was not Muslim. Is there any concrete evidence of discrimination here other than that circumstance that the person who was hired was non-Muslim? In order for there to be discrimination under the applicable standards, there has to be a strong inference of discrimination. Where is the strong inference here, again, other than your one instance of the person who took the job having been non-Muslim? Of course, Judge Marrero. First, let me say that under this court's decisions in Little, John, Seswick, and Zimmerman, the fact that he was replaced by a non-Muslim white is sufficient in and of itself to make it past the motion to dismiss. But I agree that that's not the only evidence in this case. I think there's three other instances of evidence. The first is that they manufactured a false claim about him that he had poor interpersonal skills. And that's evidence of pretext, but it's also because they chose a common stereotype of Muslims' poor interpersonal skills. That is evidence of discriminatory motive. The third piece of evidence of discrimination is the fact that they ran roughshod over their own procedures. And in this court's decision in Maneker, the court said that procedural irregularities are in and of themselves evidence of bias. And then I think there's extensive evidence of pretext in this case. Most notably, Dr. Shorey is the only person on the earth who claims that these negative statements were said about Dr. Karim. Dr. Doss talked to these supposedly negative reviewers, and they said no such negative thing to him. The people who provided the supposedly negative reviews have submitted affidavits saying they said no such thing. So whether this were a motion to dismiss or, frankly, a motion for summary judgment, this court would be constrained to conclude that Dr. Shorey manufactured those false reviews and that they were stereotyped. Thank you. Counsel, let me just reprise some of this. This is Judge Kobranich. Is it your position that Lincoln Hospital mechanically approved applicants or applications for clinical privileges? No, I would not. Yeah, okay, go ahead. I mean, we believe they did some kind of review. We just don't believe it really, you know, the 227 instances we have, it never led to a denial. Let me put it to you another way. You would agree, would you not, that the pleadings by Dr. Karim describe what we might call an individualized discretionary evaluation. Let's not go to the merits. I just want to be sure that I understand your position. You don't doubt that there was an individualized discretionary evaluation of Dr. Karim's application? I mean, I think there was. I think it was, you know, infected with discriminatory animus and stereotypes. There was an individualized analysis. I understand. I just want to make sure that at the threshold, there's no doubt that he received an individualized or discretionary evaluation, even though you have concerns about what that evaluation led to or how it reached the conclusion that it reached. I mean, I'm sorry. Go ahead. I don't think it was on the merits, just to be crystal clear. I mean, I don't think they sat down and said they made any kind of fair assessment of what Dr. Karim's credentials were. Had they done that, they would have granted him credentials as the seven other hospitals that he'd applied to all had uniformly granted him credentials in the past. They came out the opposite of seven of their predecessors. I think, frankly, it's the unusual motion to dismiss case where I think we've already induced enough evidence on discriminatory motive to get passed a motion for summary judgment. Does Dr. Karim allege that the defendants made stigmatizing statements about him? Yeah, go ahead. Certainly, all the claims that he's dictatorial, that he's a my way or the highway attitude, that he mistreats subordinates, he has poor interpersonal skills, all of those claims will prevent him from getting a job as a neurosurgeon at any other hospital in this country. Just as was the case in Brant and Belmont, and he has not been able to practice neurosurgery since those statements were made about him. Okay, let me finally let me ask you about this idea of Dr. Karim as an independent contractor or perhaps prospective independent contractor for a government agency. That is a claim, right? Yes, I think, yes. All right. Now, what's the significance of, in your view, of this purported status of Dr. Karim as an independent contractor or prospective independent contractor? Well, I think that issue in the briefing comes up specifically in the context of the liberty interest prong of the due process claim. And the defendants argue that because he wasn't obtaining government employment, the liberty interest claim did not apply. But in fact, courts, as far as I'm aware, uniformly hold that being an independent contractor is a sufficient interest to satisfy a liberty interest claim. Okay. All right. Thanks very much. You've reserved three minutes and we'll come back to you. Thank you. Let's hear from Ms. Graves-Poller, the defendant. Good afternoon. Good afternoon, Your Honor. Can you hear me okay? Yes. Okay. We have placed the court. This is Barbara Graves-Poller from the New York City Law Department for appellees. When we accept all of Dr. Karim's allegations, what we would conclude is that the hospital erred evaluating his credential application. But we cannot, no reasonable conclusion could be drawn that it infringed on any constitutionally protected property or liberty interest, or that the hospital discriminated against him based on his religion or national origin. We'll start with his first pre-process claims. And as Your Honor's questions already teased out, in large part, Dr. Karim conflates the clinical privileges that he hoped to obtain with the procedures for obtaining them. The fact of the matter is that public health law 2801B does not create a legitimate claim of in-patient hospital privileges. And the First Department has already answered the question of whether or not HHC denied his application on permissible grounds. But he cannot say that state law created a protected property interest. Now going to the bylaws of the hospital, those bylaws simply outline procedures for the efficient and effective review of applications. They do not create a rubber stamp process. HHC did adhere to its procedures as set forth in the bylaws. And just going through very quickly, those require internal review procedures and information gathering that Dr. Karim's allegations show occurred. So looking at the issue of whether or not the hospital acted on his application in a timely manner, I would direct Your Honor to page 135 of the record that explains what it means to act on an application. And that says that the governing body will act on appointments only after there's been a recommendation from the Medical Executive Committee and others. And then when we look at page 138 of the bylaws, it shows that that committee can decide to defer its decision to allow for further investigation. And that's exactly what Dr. Karim alleged in paragraph 51 through 57 of this complaint. He also consented to be interviewed to allow the committee to assess his application by consulting with other individuals. And he also agreed by submitting that application, and here I'm looking at page 134 of the record, to continually maintain his eligibility, maintain all the obligations that would be required to approve his application, including things like maintaining medical malpractice coverage. So there's no whole-scale departure from any aspect of the bylaws. And as Your Honor's questions also pointed out, Dr. Karim simply cannot distinguish the fact that he alleged from this court's decision in Greenwood. When we look at page 123 of the Greenwood decision, the court distinguished between allegations that an individual who was assigned for clinical privileges was deprived of a protected property interest, and a physician who already had privileges that were guaranteed under state law. That is not what Dr. Karim had or could possibly allege in this case. And further to Your Honor's prior question, the facts that Dr. Karim alleged here do not resemble the situation in ECWO. As ECWO involved an automatic promotion of policy, not an individualized discretionary assessment like we have here. So turning to the stigma plus claims, those fail at both the stigma and the plus. I would direct Your Honor's paragraph 4 of the complaint, because there, what Dr. Karim alleges is that, not that he had employment with any government entity, or even employment by an independent entity outside of the hospital. What he says is that he received an offer of a surplus of agreement contingent upon Lincoln granting privileges. Now, the fact of whether or not an independent contractor could raise these claims is interesting, but it's not dispositive here. This court clearly outlined in Siegel v. City of New York and Sadala v. City of Utica, what it takes to allege an actionable stigma plus claim. And notably, Dr. Karim's reply brief never alleges the lack of a stigmatizing statement by the hospital, because none could be gleaned from the facts he alleges. There's simply no protected interest at stake here, nor is there any fact suggesting that there was a public defamatory statement. So that claim was also properly dismissed. I'll turn to the discrimination claim, and as Dr. Karim's counsel argued it, those points differ considerably from what he actually alleged. The only facts that pertain to any discriminatory statement appear at paragraphs 119 through 121 of the complaint. Now, two of those are alleged upon information belief. They're entirely conclusory. In paragraph 121, it talks about an individual who could not conceivably be considered similarly situated to Dr. Karim. He alleges that Dr. Yellen, who is a physician in the neurological department, neurosurgery department, that Dr. Yellen committed a surgical error and that his privileges were not revoked. That is not similar enough to the circumstances at issue in his claim. I would also just direct Your Honor to paragraph 58 of the complaint, because there's nothing in the complaint that suggests that he was replaced at all at HHC. Again, like I mentioned earlier, he was not an employee of any entity. And to the extent he alleges or argues now that he was replaced by a non-Muslim white, as he describes it, he's referring to statements in his decision, which appears at pages 1134, 1135 of the record. And when we look at what he actually said there, which again is outside the four corners of his complaint, he said that he had no knowledge of whether or not anyone even knew he was a Muslim. He says nothing about his national origin. And then when we look at 970 of the record, all these comments that were supposedly stereotypical are actually summaries of what other individuals communicated to the hospital. Not anything that anyone at all at the hospital said about him. He summarizes what the hospital said about him in paragraph 75. And the hospital simply said that based on the assessments of individuals at other facilities, we have concerns about your ability to work well with coordinators as part of a multidisciplinary team. There's no indicia of bias there, and this comes in no way close to what this court's decision in Zimmerman addressed as a pretext showing that the Crawford reason is false. So finally, I'll just turn on the issue of repleating. Nothing in the federal rules, Rule 15A or any decision by this court required the district court to allow repleting of entirely futile claims. Dr. Kareem had an opportunity to argue the merits of his proposed third amended complaint. And it still came up lacking because he was unable to allege additional facts that secure the deficiencies that he already knew existed, having the benefit of the court's decision on the motion to dismiss. And beyond that, I think it's just important before I conclude to note the posture of this case. Dr. Kareem had an opportunity to litigate many of these same issues in state court. And he went all the way up to seeking leave to appeal to the Court of Appeals. Yet he still could not allege viable causes of action for the second amended complaint. There was no reason to allow him another opportunity to do so. And with that, I'll open for questions from you. Thank you very much. Judge Lynch, please. Yes, Ms. Graves-Pawler. As I understood it, the only somewhat negative information in the evaluations that were received were, and I'm not even sure they're negative. One was from someone in Arkansas from his residency program who said, I can't recommend him one way or the other because he transferred out of the program before I got here and I don't know him. And then someone in Michigan gave him, what I take it is a B grade rather than an F grade, said something. He didn't say his performance was unsatisfactory. He said it was satisfactory. But this is just on a form that he checked a box that didn't say, you know, well qualified. It said something less than that. And then with the opportunity to provide various criteria, the boxes he checked had to do with interpersonal type skills, arguably. That these were somehow subpar. And that's kind of it. I mean, am I wrong about that? Is there more that was the basis for turning him down? So, I think Your Honor has accurately summarized the material that was included on the form. But I would direct Your Honor back to the allegations, which actually point to much more. So, when we look at paragraph 32, Dr. Cream alleges that the chief of neurosurgery spoke with the anonymous reviewer, well anonymous for his purposes, reviewer from Michigan and gathered additional information. There's also paragraph 39 that talks about the Arkansas recommender who was unable to recommend. And then in paragraph 44, he alleges that that same chief of neurosurgery advised him of details about the Arkansas reviewer back in January 2013. So, we addressed this and we addressed this in more detail in our brief and it also was central to the state court action. The public health law shrouds much of these procedures with confidentiality. It is not that the information was not disclosed to Dr. Cream, at least in some. But in order to maintain a robust credential review procedure, the hospital had many of these conversations and gathered supplemental information after receiving those initial disclosures. And so, not all of the information that the hospital received was on the disclosure forms themselves. Okay, I hear that. Now, Mr. Mandel says though that the person who supposedly criticizes interpersonal skills somehow denied saying that. Is that not in the complaint? Or why wouldn't we think that that is at least enough to get past a motion to dismiss if your side says we have negative information, but we can't say what it is. Or at least they wouldn't tell him what it is. Or at least he alleges in his complaint that he wasn't given the details. And he says he has people denying what is claimed by the hospital. If that were in the complaint, wouldn't that be enough to raise at least some inference of discrimination? So, I'll just quickly say that the answer is that it's not in the complaint. And that some of what he points to are supposed amended complaint issues or material that he simply has admitted or argues but doesn't actually allege. But the bottom line is no. The question is not did HHG make any mistakes or weigh the evidence in a way that might have gone a different direction. The question is whether there is anything in this complaint to allege or to support an inference of discrimination motivating the hospital's actions. And even under the New York City Human Rights Laws relaxed standard, the answer has to be no. There's absolutely no allegation at all that any statement was made that ever referred to his national origin, that anyone ever referred to his religion, that even any recommender referred to any of those protected attributes. What we have is his view that claiming someone is dictatorial is an anti-Muslim bias. But that is not enough under any decision that he cites in his brief or that this court has endorsed. Okay, thank you. All right, Judge Majero, any questions? I have no questions. I have no questions, so we'll turn to Mr. Mandel, who has reserved three minutes. Thank you, Your Honor. I think I just have four points I would like to make. The first is that my friend argues for the first time here that the state court litigation has some sort of preclusive effect on this action. At page 1118 of the joint appendix, they conceded precisely the opposite, that there is no preclusive effect. And I will add that the only reason the state court litigation came out the way that it did is because the defendants concealed the identity of these people who gave these supposed negative reviews. The moment that that information was provided to Dr. Karim, we were immediately able to disprove it. And the state court litigation never would have turned out the way that it did had they complied with their obligations to turn that over. And in that regard, I will point to page 135 and 137 of the record which required Dr. Karim to waive any confidentiality whatsoever in connection with his application. And page 137-138, where Dr. Karim had an absolute right under Lincoln's own bylaws to see his file. So this idea that they were prohibited from showing this information to him during the process is simply false. They were required to provide it to him and give him an opportunity to respond. Two, with respect to the – they claim there were no stigmatizing statements that were made about Dr. Karim. That requires the court to assume that third parties made these disparaging statements about him. Of course, given that we've already disproven that that's the case, the court is constrained on a motion to dismiss to infer that, in fact, Dr. Shorey made these negative statements and Lincoln made these negative statements, not some third party. Finally, let me just simply say, with respect to the complaint amendment, to the extent there's any fact that we have alleged or discussed or argued anywhere, we are certain that it's not in the complaint. I don't believe that's the case, but to the extent it is the case, we are certainly entitled under this court's precedence an opportunity to amend at this time. As the court said in a test or value master fund, the plaintiff has an opportunity to amend so long as they specify what their amendment is after the motion to dismiss ruling and as long as it's specified either in the district court or to the court of appeals, and we have certainly satisfied our obligation to do that. Of course, under Price Waterhouse Cooper's and this court's decision in back, we have no obligation to allege stereotypes. That's something the court can take judicial notice of. Thank you very much. Thank you. Do Judge Lynch or Judge Marrero have any questions? No. No questions. No, one question. Yes. Do you contend in the complaint or anywhere else on the record that the decision makers or decision maker at Lincoln was aware that your client is a Muslim? Yes, absolutely. I mean, his name is Muhammad. Muhammad's in his name, so the moment they saw his application, they knew he was Muslim. Among the 247 other applicants that you claim, that you state the hospital gave the credentials to, were there any other Muslims? That information was not provided in discovery, and if we are successful, we're certainly going to seek out that information in discovery. Thank you. Thank you. So, you've had some discovery, is that right, Mr. Mendoza? That is correct, Your Honor. Okay, but the decision here by Judge Torres was, wasn't that on 12B-6? That is correct. Yes, okay, but you had some discovery anyway. How much and what more do you contemplate getting? The sort of hottest issue below that has not been really briefed in the appeal is whether, is comparator discovery. We would like to be able to show that there were other similarly situated white non-Muslim applicants who, you know, maybe, you know, there were some forms here that were clearly incorrectly filled out. And, you know, we would love to be able to show that when it came to white non-Muslim applicants, they didn't even bother to follow up or they found them satisfactory or they did whatever they did, but we haven't obtained that discovery. I think we also want some additional discovery on Dr. DiMattea and the fact that he was a replacement, and I think there are a host of other issues. I will confess I did not represent Dr. Karim below. I've just handled the appeal, so I know there were a number of discovery requests that were outstanding at the time this case was dismissed. Thank you very much. We'll reserve the decision, and we are adjourned. Thank you, Your Honor. Thank you. Court is adjourned.